[Civ. No. 7284.  Third Dist.  Mar. 7, 1947.]

BARRON-GRAY PACKING COMPANY (a Corporation), Plaintiff, v. J. F. TAPLEY et al., Respondents; BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION (a National Banking Association), Appellant.

Rich, Weis, Carlin & Fuidge for Appellant.

Manwell & Manwell for Respondents.

THOMPSON, J.—This is a suit by the purchaser of a crop of peaches to determine the ownership of the purchase price thereof, as between the vendors of the land, who specifically reserved a lien for 25 per cent of the unharvested crop of 1944, by the express terms of an executory contract to sell the land, and the subsequent mortgagee of the crop and chattel mortgage, with knowledge of the terms of the contract. The Bank of America filed an answer and cross-complaint. The answer of the vendors to the cross-complaint

pleaded the facts of the entire transaction and their claim of lien and ownership of one-fourth share in the crop and proceeds thereof to apply on the unpaid purchase price of the land.

The defendant J. F. Tapley owned 312 acres of farm land in Yuba County, upon which there is a peach orchard containing 25 acres of land. October 1, 1941, Tapley leased the peach orchard to S. Sasaki for three years ending October 15, 1944, for consideration of 25 per cent of the crop produced in 1942 and 1943, and 33⅓ per cent of the crop of 1944. It was stipulated the lease could not be assigned without consent of the owner. June 30, 1942, the lease was assigned to W. F. Jackson, with the written consent of Tapley. March 18, 1943, J. F. Tapley and wife contracted in writing to sell the 312-acre ranch to Ray Simmons and wife for $31,200, payable in specified installments. The contract of sale expressly reserved 25 per cent of the ''crop share rental,'' as provided in the lease to Jackson. The contract also provided that ''the landlord's share for the rental of said peach orchard shall be delivered to the cannery or canneries agreed upon.'' The purchasers immediately took possession of the ranch, except that Jackson retained the right to harvest the crop of peaches for the year 1944.

May 4, 1944, Ray Simmons and his wife, the purchasers of the ranch on said executory contract of sale, executed a promissory note for the sum of $5,400 to the Bank of America, payable on September 25, 1944, secured by a crop and chattel mortgage on the peach crop of 1944, and on specified farm machinery. June 29, 1944, Ray Simmons purported to assign to the Bank of America all proceeds of said crop of peaches which were *payable to him* from the Barron-Gray Packing Company, to which that crop was sold. Before the loan was made by the bank to Mr. and Mrs. Simmons, J. C. Dooley, the local manager of the Bank of America, was told of the lease of the orchard to W. F. Jackson, and of the terms of the contract of sale of the ranch, and prepared a release which he requested Mr. Simmons to procure from Jackson. The vice president and manager of the bank testified that he knew of the terms of the Jackson lease and the contract of sale of the ranch. There is evidence that Mr. Dooley was told, before the loan was made, that ''the Tapleys claimed twenty-five per cent of the crop.'' The crop of peaches

for the season of 1944, was sold on contract, with the consent of J. F. Tapley, and delivered to Barron-Gray Packing Company for the sum of $5,099.11. The Tapleys claimed one-fourth of that sum. The bank claimed the entire amount.

This suit was commenced October 5, 1944, by Barron-Gray Packing Company against the defendants, including the Bank of America, to determine the respective parties to whom the proceeds of said sale of fruit belong. The entire sum was paid into court to be distributed to the proper parties. The Tapleys answered the complaint, setting up the entire transaction, and claiming, under the lease and the contract for sale of the ranch, one-fourth of the proceeds of sale of the fruit. The Bank of America filed an answer and cross-complaint setting up its claim to the entire amount of proceeds of sale of fruit under its crop and chattel mortgage. The Simmons note and mortgage, their assignment of the proceeds of sale to the bank, and the contract for sale of the ranch from the Tapleys to Simmons were attached to the answer and cross-complaint as exhibits. An answer to the cross-complaint was filed by the Tapleys. At the trial, evidence, both oral and documentary, was adduced.

The court adopted findings to the effect that the bank was holder and owner of the mortgage dated May 4, 1944, to secure the unpaid debt of Ray Simmons and wife in the sum of $5,400, but that the bank's lien was subject to the claim of J. F. Tapley and wife to one-fourth of the proceeds of sale of the peach crop of 1944; that the bank took the note and mortgage with full knowledge of the claim of the Tapleys and of the terms of the previous Jackson lease and the prior contract for sale of the ranch to Mr. and Mrs. Simmons, which reserved title in the Tapleys to one-fourth of the peach crop of 1944, and the proceeds of sale thereof. The court also found that the lease of the orchard to Jackson was not rescinded or assigned to Mr. and Mrs. Simmons with the consent of the Tapleys, or at all. Judgment was rendered in favor of the defendants, J. F. Tapley and wife "to an undivided one-fourth interest of the peach crop" of 1944, or to the proceeds of sale thereof in the sum of $1,074.77. Judgment was also rendered in favor of the Bank of America, against Mr. and Mrs. Simmons, for the sum of $7,947. A motion for new trial was denied. Mr. and Mrs. Simmons have not appealed. From that portion of the

judgment which was rendered against the defendant and cross-complainant, in favor of J. F. Tapley and wife, the Bank of America has appealed.

The appellant asserts in its opening brief that the only question involved on this appeal is whether the defendants, Tapleys, are entitled to one-fourth of the proceeds of sale of the peach crop of 1944.

We are of the opinion the judgment in favor of J. F. Tapley and wife, the owners of the land in question, for the sum of $1,074.77, which appears to be less than one-fourth of the proceeds of sale of peaches for the year 1944, is amply supported by the evidence. The original lease of the orchard to Sasaki provides that the lessor, J. F. Tapley, was to receive as rental for the year 1944, 33⅓ per cent "of the *crop of 1944*," and that the lease shall not be assigned "without the written consent of lessor." That lease, with the express reservation in the lessor of 33⅓ per cent of the crop was assigned June 30, 1942, to W. F. Jackson, with the written consent of J. F. Tapley. It was in full force at the time when the appellant took the note for $5,400 from Mr. and Mrs. Simmons, secured by the crop and chattel mortgage, dated May 4, 1944. The bank then had full knowledge of the existence and terms of that lease, contract, and claim of the Tapleys. The contract to sell the land to Ray Simmons and wife, dated March 18, 1943, specifically referred to the Jackson lease, and again reserved to the lessor the said proportion of the crop of 1944, which was inadvertently stated in the contract for sale of the ranch to be "a share rental of 25%" belonging "to Sellers." June 29, 1944, Ray Simmons assigned to the bank "all proceeds [from the sale of the crop of 1944] *payable or to become payable to the undersigned* from Barron-Gray-Packing Co." That assignment did not and could not transfer to the bank the proceeds from that portion of the crop which belonged to the Tapleys. Moreover, the bank made its loan and took the crop and chattel mortgage with full knowledge of the terms of the Jackson lease and the contract for sale of the ranch, which instruments specifically retained at least one-fourth of the crop of 1944, as the property of the Tapleys. Mr. Dooley, the vice president and manager of the Rideout Branch of the Bank of America, testified to his previous knowledge of the terms of those instruments and the claim of the Tapleys to one-fourth of the crop, as follows:

"Q. Were you shown the contract of sale between them [Mr. and Mrs. Simmons] and Dr. and Mrs. Tapley? A. Yes. . . . I think we told them they would have to make a release from Jackson before we could make a loan on the crop. . . . I called Manwell a couple of times about getting the release from Jackson and I talked with Mr. Cheim about the crop several times. . . . I think you [Mr. Manwell] wrote a letter to Barron and Gray and told them not to make payment to the bank. . . . [By Mr. Manwell, attorney for the Tapleys] : Q. I told you at that time the Tapleys claimed twenty-five per cent of the crop? A. You might have told me that. . . . Q. You asked Cheim to get a subrogation from the Tapleys? A. Yes. Q. You never got it? A. I think he refused to get it."

It was stipulated Dr. Tapley would testify that he retained "twenty-five per cent interest in the orchard." There is a conflict of evidence regarding Jackson's possession of the orchard in the fall of 1943, and in 1944, after the executory contract for sale of the ranch to Mr. and Mrs. Simmons was made. Mr. Isador Cheim, who was acting as Tapley's agent and who was assisting him in operation of the ranch in 1943 and 1944, testified that, in May, 1944, they had a meeting with Dr. Tapley, at which Ray Simmons was present and he was then trying to get Jackson to leave the premises. Regarding Jackson's presence on the property and his possession of the orchard, this colloquy occurred:

"Q. Was Jackson around the place at that time? A. There is a certain period in an orchard, where there is nothing has to be done and I don't think in November and December it is necessary to do anything. Q. Was Jackson living on the place at that time? A. I believe his son was. I know Mr. Simmons was not operating the place in the fall of nineteen hundred and forty-three. . . . Q. Did you ever see Jackson in the fall of Nineteen hundred and forty three, any place? A. I did—he had a foreman on the place. . . . I saw him on the place, but not at that time. Q. Did you ever attempt to contact him about his lease on the place? A. I had no reason to contact him. He was taking care of the place. Q. You don't know whether Simmons was doing it or Jackson? A. I do. . . . I mentioned to Mr. Dooley about the contract and what it provided but that is all."

The defendants and cross-defendants, J. F. Tapley and wife, held a prior express lien, superior to the appellant's

crop and chattel mortgage, on twenty-five per cent of the peach crop and the proceeds of sale thereof, as security for payment of the purchase price of their ranch, as specifically provided by their written contract of sale to Ray Simmons and wife, dated March 18, 1943. That lien took precedence over the subsequent chattel mortgage and purported assignment which were executed by the vendees to the bank. (*Oaks* v. *Kendall,* 23 Cal.App.2d 715 [73 P.2d 1255].) The contract for sale of the land provides:

". . . Buyers agree to pay to Sellers the sum of $1,000.00 upon the execution of this agreement, the receipt whereof is acknowledged by Sellers, and the Buyers also agree to pay to Sellers the share received by them from the lease of the peach orchard on said premises which at the present time is leased to one Jackson for the seasons of 1943 and 1944 at a share rental of 25% to Sellers, and it is agreed that at no time shall said orchard be leased for a lesser crop share rental than 25% for Lessor and it is further agreed that any future lease of said peach orchard, or any part or portion of the premises hereinabove described shall be made subject to the written approval of Sellers first had and obtained.

"In the event that said crop share rental should amount to less than the sum of $2,000.00 for any year, then and in that event Buyers agree to pay to Sellers, in cash, the difference between the proceeds of said crop share rental and the sum of $2,000.00. Each annual payment of said 25% crop share rental or said sum of $2,000.00 shall be made on or before the first day of November of each year until the whole amount of the purchase price is fully paid and discharged.

"It is further agreed that the landlord's share for the rental of said peach orchard shall be delivered to the cannery or canneries agreed upon between all of the parties in the name of Sellers."

It is not disputed that the bank had full knowledge of the foregoing express terms of the contract of sale of the ranch and of the existing lease of the orchard to Jackson before the execution and acceptance of the mortgage in question.

The vendor's lien, which we have held exists in the present case, involves only the express lien reserved by the terms of the contract of sale, as distinguished from the general implied vendor's lien, to secure payment of the vendor's one-fourth interest in the peach crop and the proceeds of sale

thereof to·apply on the unpaid portion of the purchase price of the ranch. Such lien is uniformly recognized and upheld by the authorities. (*Avery* v. *Clark*, 87 Cal. 619 [25 P. 919, 22 Am.St.Rep. 272]; *Kent* v. *Williams*, 114 Cal. 537 [46 P. . 462]; Civ. Code, § 3046; 25 Cal.Jur. § 208, p. 739; 66 C.J. § 793, p. 1041; 91 A.L.R. 148, n.) In the Avery case, *supra*, it is said at page 625:

"Properly speaking, a vendor's lien does not exist until the vendor has parted with his title. So long as he retains the title he cannot be said to have any implied lien upon the land. *The security which he then has for the purchase-money is created by express reservation, and cannot be impaired by any act of the vendee. This is an express lien existing by virtue of a contract executed between the parties, and is capable of assignment and enforcement by his assignee.* (*Taylor* v. *McKinney*, 20 Cal. 618.) Such a lien is open and manifest to the world, and is entirely different from the secret, invisible lien which the law implies in behalf of the vendor when he parts with the title, and which is known only to the parties to the transaction, and those to whom they may communicate the fact. For such a lien equity makes no special provision, but leaves the parties to rely upon the contract which they have executed between themselves." (Italics added.)

To the same effect is the case of *Oaks* v. *Kendall, supra,* in which a rehearing was denied by the Supreme Court.

In 66 Corpus Juris, section 793, page 1041, it is said:

"The rights and liabilities of the parties as to rents and profits may, of course, be governed by express agreement, whereby the right to rents and profits may be reserved to the vendor."

We conclude that the trial court properly determined that the vendors, J. F. Tapley and wife, reserved by contract, and are entitled to, one-fourth of the peach crop of 1944, and the proceeds of sale thereof, pursuant to the express terms of the contract of sale of the ranch, of which the mortgagee had full knowledge, which reserved interest and lien of the vendor is prior and paramount to the appellant's mortgage, and which interest the vendee could not impair by assignment or otherwise. The appellant took the vendee's assignment of that share of the crop with full knowledge of the terms of the contract, and is bound thereby.

The case of *Allen* v. *Wilson*, 178 Cal. 674 [174 P. 661], upon which the appellant relies in support of its contention that a

lien on real property does not exist when the vendor retains the title thereto under an executory contract to sell the land, is not in conflict with what we have said regarding the lien which may be created by the express terms of the contract. In that case P. J. Wilson sold certain lots in Los Angeles to E. L. Barrett, upon an executory contract. The vendee took possession of the lots and, with full knowledge of the vendor, tore down three buildings and constructed a large new house on the premises. The plaintiff, Allen, who furnished materials and labor for the construction of the dwelling house, brought suit under section 1183 of the Code of Civil Procedure to foreclose his mechanic's lien. No reservation of an express lien by contract was involved in that case. It merely determines that the mechanic's lien was valid and enforcible since the building was constructed by acquiescence and knowledge of the owner of the land as provided by section 1192 of the Code of Civil Procedure.

The appellant relies on the case of *Triest & Co.* v. *Goldstone,* 173 Cal. 240 [159 P. 715], which upheld the judgment of a trial court determining that the lessor of real property was estopped from denying the surrender of his lease by his knowledge of the change of lessees and his acceptance of rent from the new lessees which operated as a surrender of the original lease by operation of law. That case is not in conflict with the decision of the trial court in the present case. It is readily distinguishable from the facts of this case. In this case the contract of sale of the land specifically referred to the prior lease and reserved to the lessors the rental therein provided for. The entire conduct of the lessors and their continuing demands for the rent clearly indicate that they did not intend to surrender the lease or waive the rent. The appellant had full knowledge of that fact. Moreover, the Triest case holds that the question of the surrender of a lease "is a question of fact *to be determined in the first instance by the trial court.*" In the present case the trial court found that the lease had not been surrendered. That finding is controlling upon this court if there is any substantial evidence to support it, which we have held exists.

The facts of the Triest case were that plaintiff, in July, 1907, leased a building in San Francisco to Goldstone Brothers, a corporation, for ten years at $400 rental per month. In 1909, the corporation forfeited its charter and became defunct.

The stockholders, consisting of four brothers, organized two separate partnerships, and divided portions of the leased building between the two partnerships, each of which thereafter occupied its separate establishment and paid the lessor $200 per month as rental therefor. That division of defendants' business and their separate obligations for rent of their respective places of business and the dissolution of the corporation were fully known to the lessor who acquiesced in the change of obligations by accepting rent from each partnership. The lessor had a place of business next door to one of the partnership enterprises. The lessor knew all about the entire transaction and the change of lessees. He recognized the separate liabilities of the different partnerships by accepting rent from each party for several years until 1912, giving separate receipts for the rent. The lessor never indicated by any act or assertion that it relied upon the original lease as a joint obligation for the $400 rental for the entire building. In 1912, one of the businesses was removed from the premises and that partnership thereafter refused to pay its $200 share of the rent. The lessor then commenced suit to recover the delinquent rent from each of the four brothers who were the original stockholders of the defunct corporation. The trial court found that the lessor, with full knowledge of the transaction, surrendered the original lease in November, 1910, when the corporation forfeited its charter, and then resumed possession of the premises, thereafter renting the separate portions of the building to other tenants. The court said in that regard: "On the 30th day of November, 1910, the plaintiffs resumed possession of the demised premises, and other persons became tenants of said plaintiffs of said premises." Under such circumstances the Supreme Court properly held that "the evidence is sufficient to sustain the finding of the court that there was such a surrender."

Before we could hold in the present case that the lessor surrendered his right to payment of one-fourth of the peach crop of 1944, as rental under the existing lease to Jackson, it would be necessary for us to hold there is no evidence to support the trial court's finding to the contrary. The contract for sale of the property specifically referred to that provision of the Jackson lease. It is uncontradicted that the mortgagee had full knowledge of the provisions of the contract of sale in that regard and of the vendor's claim to his reserved

share of the crop of 1944, and the proceeds therefrom. The mortgage was therefore accepted by the appellant subject to that express lien.

The judgment is affirmed.

Adams, P. J., and Peek, J., concurred.

A petition for a rehearing was denied April 5, 1947.